UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: September 30, 2014
```

In re JP MORGAN AUCTION RATE
SECURITIES (ARS) MARKETING
LITIGATION

10 MD 2157 (PGG)

---

CELLULAR SOUTH, INC.,

                    Plaintiff,

          - against -

J.P. MORGAN SECURITIES, INC., AND
JOHN DOES A through D,

                    Defendants.

**MEMORANDUM
OPINION & ORDER**

10 Civ. 4552 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          Plaintiff Cellular South, Inc., an investor in auction rate securities ("ARS"),

brings this action against Defendant J.P. Morgan Securities, Inc. ("JP Morgan"), a securities

broker-dealer and wholly owned subsidiary of J.P. Morgan Chase & Co. that underwrote,

marketed, and sold ARS and conducted the auctions at which the securities' interest rates were

set.  The Complaint asserts federal and state law claims against JP Morgan for (1) violations of

Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"); (2)  violations of

Mississippi law; (3) breach of contract and breach of the implied covenant of good faith and fair

dealing; and (4) negligent and/or fraudulent misrepresentations and omissions.  Plaintiff claims

that Defendant profited by knowingly misrepresenting and omitting material information

concerning the liquidity of its ARS products, and by manipulating the ARS market through the

regular placement of support bids in its own auctions.  JP Morgan has moved to dismiss the

Complaint for failure to state a claim. For the reasons stated below, Defendant's motion to dismiss will be granted.

## BACKGROUND

### I.    PROCEDURAL HISTORY

This case is one of five that comprise the Multidistrict Litigation ("MDL") known as In re JP Morgan Auction Rate Securities Litigation, 10 MD 2157. In an order dated June 9, 2010, In re: JP Morgan Auction Rate Sec. (ARS) Mktg. Litig., MDL 2157, 2010 WL 2380874 (June 9, 2010), the Judicial Panel on Multidistrict Litigation (the "MDL Panel") granted a motion by defendants JPMorgan Chase & Co., J.P. Morgan Securities, Inc., JPMorgan Chase Bank, N.A., and Bear, Stearns & Co., Inc. to centralize five actions that had been brought against defendants in various district courts throughout the country. Accordingly, pursuant to 28 U.S.C. § 1407, the MDL Panel transferred four actions to this Court for coordinated or consolidated pretrial proceedings with O'Gara v. JP Morgan Chase & Co. et al., 09 Civ. 6199 (PGG), a class action securities fraud action then pending in this Court.[1]

On March 31, 2012, this Court issued an order dismissing the O'Gara complaint. See In re JP Morgan Auction Rate Sec. (ARS) Mktg. Litig., 867 F. Supp. 2d 407, 411 (S.D.N.Y. 2012) ("O'Gara").[2] Although O'Gara involved a purported class action, the factual allegations in that case and the present action are nearly identical. Accordingly, this Court will refer to and rely heavily on its prior opinion in analyzing the sufficiency of Plaintiff's complaint.

---

[1]  In addition to this action, the MDL Panel assigned the following cases to this Court: Bankr. Mgmt. Solutions, Inc. et al. v. JP Morgan Chase Bank, N.A. et al., 10 Civ. 926; Fulton Financial Advisors, Nat'l Ass'n v. Bear, Stearns & Co, Inc., 10 Civ. 4554; and Fulton Financial Advisors, Nat'l Ass'n v. J.P. Morgan Securities, Inc., 10 Civ. 4555.

[2]  The present action is the only remaining MDL case. The other three actions were dismissed by voluntary stipulation. See Dkt. No. 23, 10 Civ. 926; Dkt. No. 63, 10 Civ. 4554; Dkt. No. 56, 10 Civ. 4555.

## II.    **AUCTION RATE SECURITIES**

ARS are bonds or preferred stocks that pay interest or dividends at rates set at periodic "Dutch" auctions.[3] (Cmplt. (Dkt. No. 1) ¶¶ 16, 20)  Broker-dealers, such as JP Morgan, manage the auctions and accept orders for the purchase and sale of ARS.  (Id. ¶ 22)  In a typical auction, potential buyers place bids for a specific quantity of ARS at a particular interest or dividend rate.  (Id. ¶ 25)  The clearing rate – i.e., the rate at which the last securities were sold – is the interest rate that will be paid on the securities until the next auction.  (Id. ¶ 25)

An auction fails whenever the number of shares offered for sale exceeds the number of shares bid for purchase.  (Id. ¶ 32)  In the event of a failed auction, the holder of the security cannot sell its shares but is entitled to receive dividends or interest at a predetermined rate – known as the "penalty rate" or "maximum rate" – until the next auction.  (Id.)  The maximum rate is intended to ensure that the auction rate security remains liquid if the auction fails, by either attracting new buyers or prompting the issuer to refinance.  (Id. ¶ 33)

According to Plaintiff, during the time period in question – 2007-2008 – an ARS that carried a low maximum rate was dependent on the broker-dealer's intervention and "support" to ensure liquidity.  (Id. ¶ 34)  Unlike some other securities, ARS did not have a "put feature guaranteeing that an investor could either sell the securities back to the broker-dealer on demand at par value or force the issuer to redeem the securities."  (Id. ¶ 35)  Consequently,

---

[3] "In a Dutch auction, interested investors bid the lowest interest rate at which they are willing to purchase the securities, and the auction 'clears' at the lowest rate at which there are sufficient bidders to purchase all offered securities.  If there are insufficient bidders to purchase all the offered securities, the auction 'fails.'"  In re CitiGroup Inc. Bond Litig., 723 F. Supp. 2d 568, 578 (S.D.N.Y. 2010).

"[h]olders of auction rate securities depended on the integrity of the broker-dealers and the auctions to ensure that the securities remained liquid." (Id.)

## III.    CELLULAR SOUTH'S ARS PURCHASES

Plaintiff, a Mississippi corporation, retained Sovereign Advisors, LLC ("Sovereign") to, inter alia, purchase highly liquid investments on Cellular South's behalf. (Id. ¶¶ 13, 36)  Plaintiff alleges that – based on a JP Morgan employee's repeated representation that ARS are "very liquid" investments – Sovereign purchased JP Morgan ARS on Cellular South's behalf on August 16, 2007 and August 21, 2007 (the "Purchase Dates"). (Id. ¶¶ 1, 37-39)  The ARS that Sovereign purchased, "were issued from trusts that hold certain trust certificates relating to Bank of America non-cumulative preferred stock." (Id. ¶ 2)

In addition to alleging that it was fraudulently induced to purchase the securities as a result of the JP Morgan employee's misrepresentations, Plaintiff alleges that JP Morgan did not disclose that (1) the liquidity of JP Morgan ARS "depended exclusively on J.P. Morgan's ability to continue to engage in the routine, systematic, far-reaching and widespread practice of purchasing JP [Morgan] ARS at JP [Morgan] ARS auctions in order to prevent auction failures and perpetuate the illusion of an active, viable market" (id. ¶ 41); (2) the auction rates were "manipulated by J.P. Morgan to achieve certain business goals," (id. ¶ 42); and (3) JP Morgan had identified, as far back as June 2007, "significant" problems with the ARS market (id. ¶ 43).

In early February 2008, JP Morgan stopped purchasing JP Morgan ARS, causing the JP Morgan ARS market to collapse. (Id. ¶ 44)  Plaintiff has since attempted to sell the securities, but is unable to do so without incurring a significant loss. (Id. ¶ 45)

IV.   **JP MORGAN'S SUPPORT BIDS**

The Complaint alleges that the ARS transactions at issue were part of a broader scheme by JP Morgan to defraud ARS purchasers.  According to the Complaint, both prior to and after the Purchase Dates, JP Morgan used its own capital to place "support bids" in every auction in which it served as the auction manager to "create the appearance of stability and liquidity and to prevent auction failures."  (Id. at 11, ¶ 51)  Because JP Morgan exercised almost complete control over the information associated with the auctions, JP Morgan "knew that the number of buyers for JP [Morgan] ARS was increasingly below the number of sellers for JP [Morgan] ARS," and that without JP Morgan's intervention, the auctions would have failed.  (Id. ¶¶ 52-53)

In 2007, liquidity in the ARS market began to deteriorate.  In an effort to mask this deterioration and prop up the ARS market, "auction managers, including JP Morgan, increased their support for otherwise failing auctions by bidding for their own positions on a widespread basis, giving other market participants the false impression that the market was functioning normally when investor demand for ARS had in fact decreased."  (Id. ¶ 61) Investors such as Cellular South were unaware of the scale of JP Morgan's interventions and believed that JP Morgan ARS traded in an efficient market.  (Id. ¶¶ 62, 114)

V.   **ALLEGED MISREPRESENTATION OF RISK**

According to Plaintiff, JP Morgan concealed the risks of ARS from investors. Plaintiff claims that JP Morgan "failed to disclose to investors the extent to which it made support bids, its reasons for intervening to prevent auction failures, and the impact of its support bids on the market for [JP Morgan] ARS."  (Id. ¶ 55)  "By managing the clearing rates, rather than allowing them to be set at a competitive auction by true market forces, [JP Morgan] was

able to and did deprive investors, such as Cellular South, of the rates of return on their investment they were entitled to receive absent such interference." (Id. ¶ 59)

Plaintiff claims that JP Morgan did not disclose the risks to investors despite its "knowledge of . . . increasing turmoil in the auction rate securities market . . . ." (Id. ¶ 68) In support of this assertion, the Complaint cites to a February 1, 2008 memorandum that Defendant sent to the State of California, in which it "privately disclosed its knowledge of: 'significant' problems in the [ARS] market dating back to June 2007; multiple failed auctions; the current 'volatility' in the [ARS] market; and growing 'concerns' regarding the ARS market." (Id. ¶ 69) The memo, which was also relied on by the O'Gara plaintiffs,[4] provides, in relevant part:

> The auction rate [securities] market has experienced a significant dislocation stemming from the liquidity crises since June 2007. After a period of relative recovery in September and early October, the last two months have had a decidedly different tone as credit concerns continue to grow. In the past few weeks, as we have witnessed a series of ratings downgrades to three monoline insurers, there have been failed auctions with those issuers defaulting . . . . It should be pointed out that there are a number of factors that are contributing to the volatility in the municipal ARS market:
>
> • Exposure to monoline insurers;
> • Underlying ratings on the bonds;
> • Lack of investor liquidity "put"; and
> • Seasonal balance sheet constraints.
>
> As a result, many ARS issuers are reviewing their current exposure and considering whether the time may be right to exit the ARS market for another mode with less volatility or risk. . . .
>
> While the State of California's 2003D bonds have experienced some widening over the past few months, the State is not seeing the extraordinary widening that is being felt by much of the ARS market. JPMorgan believes that the State has benefited greatly from the fact that its auction rate securities are uninsured (less than 5% of the ARS tax-exempt market is uninsured). In effect, the lack of insurance has allowed the State to sidestep most of the current deterioration that has impacted the insured auction rate market. Although the State finds itself in a favorable position relative to some other ARS issuers, the State must remain

---

[4] See O'Gara, 867 F. Supp. 2d at 412-13.

vigilant going forward because of the continued possibility of failed auctions and the potential further deterioration of the general ARS market. . . .

With these thoughts in mind, JPMorgan recommends that the State continue in the ARS mode on its 2003D bonds for the time being, but review its exposure over the next three weeks as two additional series (Series D-2 and D-3) reset for an additional 35 days. This review should take into consideration where the auction rate securities reset relative to their historical performance, as well as in relation to the SIFMA index over similar timeframes. Should further ARS market deterioration continue over this period, or should the State's ARS widen substantially or suffer from a failed auction, the State will have ample time to consider possible alternatives to staying in the ARS mode. . . .

In closing, should the State's auction rate securities remain relatively impervious to the shake-up tak[ing] place in the ARS market, we believe the prudent course of action is for the State to stay the course and monitor how its ARS continue to trade, both on a historical and relative basis. Should conditions change, JPMorgan is available and stands ready to assist the State in developing a financing plan to address additional widening of its 2003D spreads and/ or a continued deterioration of the auction rate market. . . .[5]

(Reply Declaration of Jonathan K. Youngwood ("Youngwood Reply Decl.") (Dkt. No. 23), Ex.

G at 1-3)

---

[5] In determining the sufficiency of a complaint for purposes of Rule 12(b)(6), this Court's consideration is limited to "the factual allegations in plaintiffs' . . . complaint, . . . to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which the plaintiffs had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993) (citations omitted); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (documents may be considered when they are "integral" to the complaint); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) (court may rely on documents affixed to movant's papers in motion to dismiss if "plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint").

While the Second Circuit has cautioned that "[l]imited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint," Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004), in this case the Complaint relies heavily on the February 1, 2008 JP Morgan memorandum to the State of California. Accordingly, this document will be considered in resolving the motion to dismiss.

## VI.     COLLAPSE OF THE ARS MARKET

In the summer of 2007, several major auction dealers – not including JP Morgan – "chose not to intervene to prevent failures of a few auctions for securities that were viewed by the credit markets as particularly undesirable." (Cmplt. (Dkt. No. 1) ¶ 66)  Despite its awareness of the "increasing turmoil in the auction rate securities market," JP Morgan "continued to encourage investors to purchase and retain auction rate securities up to an including the first half of February 2008." (Id. ¶ 68)

On or around February 13, 2008, "all major broker-dealers of [ARS] refused to continue to support the auctions." (Id. ¶ 72)  "As a result of the withdrawal of support by JP Morgan and all other major broker-dealers, the market for [ARS] collapsed, rendering more than $300 billion of such securities illiquid." (Id. ¶ 73)  The Complaint further alleges that JP Morgan did not notify Sovereign or Cellular South, prior to February 13, 2008, of its intention to "allow the auctions to fail." (Id. ¶ 74)

## VII.    JP MORGAN'S DISCLOSURES

According to the Complaint, JP Morgan has been the target of various investigations by state and federal regulators and law enforcement. (Id. ¶ 75)  The Securities and Exchange Commission conducted an investigation of JP Morgan's practices with respect to ARS beginning in 2004. (Id. ¶ 76)  On May 31, 2006, the SEC filed an Order Instituting Administrative Cease-And-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions against JP Morgan and other broker-dealers. (Id. ¶ 76)  The SEC found that between January 1, 2003, and June 30, 2004, JP Morgan and other broker-dealers had willfully violated Section 17(a)(2) of the Securities Act of 1933 by, inter alia, "intervening in auctions by bidding for their proprietary accounts or asking customers to make or change orders in order to prevent

failed auctions." (Id. ¶ 77)  The SEC further found that JP Morgan's unlawful conduct had

"affected the clearing rate, and [the Commission] required JP Morgan to cease and desist and/or

make sufficient disclosures of these manipulative practices."  (Id.)

In response to the SEC's cease-and-desist order, JP Morgan placed a disclosure

document on its website.  This document – dated August 15, 2006 – is entitled, "Tax Exempt

Capital Markets – J.P. Morgan Securities Inc. Material Auction Practices and Procedures" and

states in relevant part:

> JPMorgan is permitted, but not obligated, to submit orders in Auctions for its own
> account either as a bidder or seller, and routinely does so in its sole discretion.  If
> JPMorgan does so, it would likely have an advantage over other bidders because it would
> have knowledge of some or all of the other orders placed through it in that auction and,
> thus, could determine the rate and size of its order so as to ensure that its order is likely to
> be accepted in the auction and that the Auction is likely to clear at a particular rate. . . .
>
> JPMorgan may place one or more bids in an Auction for its own account to acquire
> securities for its own account, to prevent an Auction in which the auction agent does not
> receive sufficient orders at or below a specified "maximum interest rate" to purchase all
> the securities being sold (a "Failed Auction") (which would result in the Auction Rate
> being set at a "Maximum Interest Rate"), or to prevent an Auction from clearing at a rate
> that JPMorgan believes does not reflect the market for the securities. . . . JPMorgan may
> also encourage bidding by others in the Auction, including to prevent a failed auction or
> to prevent an Auction from clearing at a rate that JP Morgan believes does not reflect the
> market for the securities. . . . JPMorgan routinely places such bids, or encourages others
> to bid, in Auctions.
>
> Bids by JPMorgan or by those it encourages to place bids are likely to affect (i) the
> auction rate for a particular Auction, including preventing that rate from being set at the
> Maximum Interest Rate for a particular Auction or otherwise causing bidders to receive a
> higher or lower rate than they might have received had JPMorgan not bid or encouraged
> others to bid, and (ii) the allocation of the securities being auctioned, including displacing
> some bidders who may have their bids rejected or receive fewer securities than they
> would have received if JPMorgan had not bid or encouraged others to bid.  Because of
> these practices, the fact that an Auction clears successfully does not mean that an
> investment in these securities involves no significant liquidity or credit risk.  JPMorgan is
> not obligated to continue to place such bids or encourage other bidders to do so in any
> particular Auction to prevent an Auction from failing or clearing at a rate that JPMorgan
> believes does not reflect the market for the securities.  Customers should not assume that
> JPMorgan will do so or that Failed Auctions will not occur.

(Declaration of Jonathan K. Youngwood ("Youngwood Decl.") (Dkt. No. 21), Ex. A, at 2-3)[6]

According to the Complaint, Plaintiff purchased the ARS at issue in August 2007 (Cmplt. ¶ 1),

approximately one year after JP Morgan had posted this disclosure on its website.

      The prospectus for the ARS products purchased by Plaintiff (the "Class A

Auction Rate Trust Certificates" or "Class A Certificates") contained similar disclosures with

respect to the role of the broker-dealer at auctions.  The prospectus provides that

> [t]he Broker-Dealer is permitted, but not obligated, to submit Orders in Auctions for the
> Class A Certificates for its own account either as a buyer or seller and routinely does so
> in the auction rate securities market in its sole discretion.  If the Broker-Dealer submits an
> Order for its own account, it would have an advantage over other Bidders because
> Broker-Dealer would have knowledge of the other Orders placed through it in that
> Auction for the Class A Certificates and, thus, could determine the rate and size of its
> Order so as to increase the likelihood that (i) its Order will be accepted in the Auction for
> the Class A Certificates and (ii) the Auction for the Class A Certificates will clear at a
> particular rate. . . .

> The Broker-Dealer routinely places bids in auctions generally for its own account to
> acquire securities for its inventory, to prevent an "Auction Failure Event" (which occurs
> if there are insufficient clearing bids and results in the Auction Rate being set at the
> Maximum Rate) or to prevent an auction from clearing at a rate that such broker-dealer
> believes does not reflect the market for such securities. . . .

> The Broker-Dealer also may encourage bidding by others in Auctions for the Class A
> Certificates, including to prevent an Auction Failure or to prevent an Auction for the
> Class A Certificates from clearing at a rate that the Broker-Dealer believes does not
> reflect the market for the Class A Certificates.  The Broker-Dealer may encourage such
> Bids even after obtaining knowledge of some or all of the other Orders submitted through
> it.

> Bids by the Broker-Dealer or by those it may encourage to place Bids are likely to affect
> (i) the Auction Rate – including preventing the Auction Rate from being set at the
> Maximum Rate or otherwise causing Bidders to receive a lower rate than they might have
> received had the Broker-Dealer not Bid or not encouraged others to Bid and (ii) the
> allocation of the Class A Certificates being auctioned – including displacing some
> Bidders who may have their Bids rejected or receive fewer Class A Certificates than they
> would have received if the Broker-Dealer had not Bid or encouraged others to Bid.
> Because of these practices, the fact that an Auction for the Class A Certificates clears

---

[6]  This document is referred to in paragraph 78 of the Complaint, and was similarly referenced
and relied upon by the O'Gara plaintiffs.  See O'Gara, 867 F. Supp. 2d at 413 n.1.

successfully does not mean that an investment in the Class A Certificates involves no significant liquidity or credit risk.  The Broker-Dealer is not obligated to continue to place such Bids or to continue to encourage other Bidders to do so in any particular Auction for the Class A Certificates to prevent an Auction Failure or an Auction for the Class A Certificates from clearing at a rate the Broker-Dealer believes does not reflect the market for the Class A Certificates.  Investors should not assume that the Broker-Dealer will place Bids or encourage others to do so or that Auction Failures will not occur. . . .

An Existing Owner may sell, transfer or dispose of a Class A Certificate (i) in an Auction for the Class A Certificates, only pursuant to a Bid or Sell Order in accordance with the Auction Procedures, or (ii) outside an Auction for the Class A Certificates, only to or through a Broker-Dealer for the Class A Certificates.

Existing Owners will be able to sell all of the Class A Certificates that are the subject of Submitted Sell Orders only if there are Bidders willing to purchase all those Class A Certificates in the Auction for Class A Certificates.  If Sufficient Clearing Bids have not been made, Existing Owners that have submitted Sell Orders will not be able to sell in the Auction for the Class A Certificates all, and may not be able to sell any, of the Class A Certificates subject to such Submitted Sell Orders.  As discussed above (see "Bidding by Broker-Dealer"), the Broker-Dealer may submit a Bid in an Auction for the Class A Certificates to avoid an Auction Failure, but it is not obligated to do so.  There may not always be enough Bidders to prevent an Auction Failure in the absence of the Broker-Dealer Bidding in the Auction for the Class A Certificates for its own account or encouraging others to Bid.  Therefore, Auction Failures are possible, especially if the Underlying Issuer's credit were to deteriorate, if a market disruption were to occur or if, for any reason, the Broker-Dealer were unable or unwilling to Bid.

(Youngwood Decl. (Dkt. No. 21), Ex. C, 18-21)[7]

## DISCUSSION

## I.   LEGAL STANDARD

   "To survive a motion to dismiss, a claim must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556

---

[7] "As with the 2006 SEC Order and [JP Morgan] ARS website, th[is] Court may take judicial notice of the prospectus[ ] for the securities at issue without converting the motion to dismiss into a motion for summary judgment."  In re Merrill Lynch Auction Rate Sec. Litig., 704 F. Supp. 2d 378, 386 (S.D.N.Y. 2010) ("Merrill I") (citing Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991)), aff'd sub nom. Wilson v. Merrill Lynch & Co., 671 F.3d 120 (2d Cir. 2011).

U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "In

considering a motion to dismiss . . .  the court is to accept as true all facts alleged in the

complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing

Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)),

and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez v.

Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

　　　　　A complaint is inadequately pled if it merely "offers 'labels and conclusions' or 'a

formulaic recitation of the elements of a cause of action.'"  Iqbal, 556 U.S. at 678 (quoting

Twombly, 550 U.S. at 555), or if it does not provide factual allegations sufficient "to give the

defendant fair notice of what the claim is and the grounds upon which it rests."  Port Dock &

Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550

U.S. at 555).

　　　　　A plaintiff alleging securities fraud and related causes of action must meet a

heightened pleading standard in order to survive a defendant's motion to dismiss.  The Private

Securities Litigation Reform Act ("PSLRA") – which was enacted "[a]s a check against abusive

litigation by private parties," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313

(2007) – requires a plaintiff who alleges securities fraud based on a misrepresentation or

omission of material fact to "specify each statement alleged to have been misleading, [and] the

reason or reasons why the statement is misleading . . . ."  15 U.S.C. § 78u–4(b)(1)(B).  The

PSLRA also requires that in any securities fraud action "the complaint shall, with respect to each

act or omission alleged to violate [the Securities Exchange Act], state with particularity facts

giving rise to a strong inference that the defendant acted with the required state of mind."  15

U.S.C. § 78u–4(b)(2)(A).

In addition to the pleading requirements of the PSLRA, Fed. R. Civ. P. 9(b) applies to any claim sounding in fraud. Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004). Rule 9(b) provides that "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud . . . ." The Second Circuit has "repeatedly held" that Rule 9(b) "requires the plaintiff to '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Nakahata v. New York-Presbyterian Healthcare Sys., Inc., 723 F.3d 192, 197 (2d Cir. 2013) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

## II.   PLAINTIFF HAS NOT STATED A SECURITIES FRAUD CLAIM

Like the plaintiffs in O'Gara, Plaintiff's securities fraud claims here are premised on Defendant's purported material misstatements or omissions and manipulation of the ARS market. See O'Gara, 867 F. Supp. 2d at 411. To state a material misstatement or omission claim under Section 10(b) and Rule 10b-5, Plaintiff must "allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." ATSI Commc'ns, Inc. v. Sharr Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007) (citing Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)). To state a claim for market manipulation, Plaintiff must allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." Id. at 101 (citing Schnell v. Conseco, Inc., 43 F. Supp. 2d 438, 448 (S.D.N.Y. 1999); Cowen & Co. v. Merriam, 745 F. Supp. 925, 929 (S.D.N.Y. 1990)).

Here, "[t]hese two claims are interrelated . . . because Plaintiff's market manipulation claim[ ] involve[s] a failure to disclose fully [JP Morgan's] ARS market activities," In re Merrill Lynch Auction Rate Sec. Litig., 851 F. Supp. 2d 512, 524 (S.D.N.Y. 2012) ("Merrill III"), aff'd sub nom. Louisiana Pac. Corp. v. Merrill Lynch & Co., 13-1980-CV, 2014 WL 2870146 (2d Cir. June 25, 2014), "[a]nd 'nondisclosure is usually essential to the success of a manipulative scheme.'" Id. (quoting Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 477 (1977)). Accordingly, the Court will proceed by addressing "the legal elements common to both claims." Id.

### A.    Plaintiff Has Not Adequately Pled Manipulative Conduct or Material Misrepresentations

Here, Plaintiff's material misrepresentation and market manipulation claims fail for the same reason that nearly every other ARS-based securities fraud claim in this Circuit has failed:  the activity complained of was adequately disclosed to the market.  See, e.g., Wilson v. Merrill Lynch & Co., 671 F.3d 120, 132, 140 (2d Cir. 2011) ("we find no error in the district court's conclusion that Merrill's disclosures of its support bidding practices sufficed to preclude [plaintiff's] claim that these practices were manipulative"; "we hold that Merrill's disclosures of its bidding practices preclude [plaintiff's] market manipulation claim"); Merrill III, 851 F. Supp. 2d at 525 ("Plaintiff's misstatement and market manipulation claims predicated on purchases that followed the Website Disclosure fail because the Website Disclosure adequately disclosed Merrill's ARS practices."); In re Citigroup Auction Rate Sec. Litig., 700 F. Supp. 2d 294, 307 (S.D.N.Y. 2009) ("Citigroup") ("Here, Defendants disclosed the practices of which Plaintiff now complains; absent specific allegations of the basis for Plaintiff's incorrect assumptions about the ARS market and the reasonableness of the alleged reliance in the face of such disclosure, Plaintiff's market manipulation claim must be dismissed.").

Simply put, "[t]he market is not misled when a transaction's terms are fully disclosed." In re Merrill Lynch Auction Rate Sec. Litig., 704 F. Supp. 2d 378, 390 (S.D.N.Y. 2010) ("Merrill I"), aff'd sub nom. Wilson v. Merrill Lynch & Co., 671 F.3d 120 (2d Cir. 2011); see also In re UBS Auction Rate Sec. Litig., 08 CIV. 2967 (LMM), 2010 WL 2541166, at *18 (S.D.N.Y. June 10, 2010) ("Defendants persuasively argue that Plaintiffs cannot premise a claim of securities fraud under Section 10(b) on conduct and risks that were previously disclosed to the investing public. . . . Since . . . [p]laintiffs were not led to believe one thing when another was true, a reasonable jury could not find that [d]efendants' alleged conduct was deceptive.").

Here, the activities that Cellular South complains of – i.e., JP Morgan's bidding for its own account to prevent failed auctions and to maintain "the appearance of stability and liquidity" (Cmplt. (Dkt. No. 1) ¶ 4) – were repeatedly disclosed to Plaintiff and the market in numerous publicly available documents.  In 2006 – well before Plaintiff's purchase of ARS – JP Morgan placed a disclosure on its website that, inter alia, informed investors that JP Morgan (1) was permitted, but not obligated, to submit orders for its own account, (2) "would likely have an advantage over other bidders" due to its access to non-public information, and (3) had, in fact, "routinely" placed support bids or encouraged others to do so to prevent auction failures. (Youngwood Decl. (Dkt. No. 21), Ex. A at 2-3)  The website disclosure further warned investors that

> [b]ecause of these practices, the fact that an Auction clears successfully does not mean that an investment in these securities involves no significant liquidity or credit risk.  JPMorgan is not obligated to continue to place such bids or encourage other bidders to do so in any particular Auction to prevent an Auction from failing or clearing at a rate that JPMorgan believes does not reflect the market for the securities.  Customers should not assume that JPMorgan will do so or that Failed Auctions will not occur.

(Id. at 3)

The prospectus for the ARS that Cellular South purchased disclosed substantially the same information, including that JP Morgan (1) was "permitted, but not obligated" to submit orders for its own account and that it "routinely d[id] so in the auction rate securities market"; (2) would have an advantage over other buyers if it chose to purchase ARS; (3) had "interests in serving as a Broker-Dealer in an Auction [that] may differ from those of Existing Owners and Potential Owners who participate in Auctions for the Class A Certificates"; (4) "routinely" placed bids to prevent auction failures; and (5) was "not obligated to continue to place such Bids . . . to prevent an Auction Failure or an Auction . . . from clearing at a rate the Broker-Dealer believes does not reflect the market for Class A Certificates.  Investors should not assume that the Broker-Dealer will place Bids or encourage others to do so or that Auction Failures will not occur." (Youngwood Decl. (Dkt. No. 21), Ex. C at 18-19)

As this Court noted in O'Gara, "[i]n other ARS-related litigation in this District, courts have found disclosures similar to JP Morgan's 2006 disclosure sufficient to preclude a finding of market manipulation, since disclosure defeats any allegation that a defendant acted with the goal of deceiving investors." O'Gara, 867 F. Supp. 2d at 427 (citing cases).

In an attempt to stave off dismissal, Plaintiff argues that JP Morgan's "disclosures [did not] reveal[ ] the extent of its participation in the auction process or that liquidity depended exclusively upon its participation[.]"  (Plaintiff Cellular South, Inc.'s Memorandum of Law in Opposition to Defendant J.P. Morgan Securities Inc.'s Motion to Dismiss the Complaint ("Pltf. Br.") at 14)  But this argument is foreclosed by the Second Circuit's decision in Wilson v. Merrill Lynch & Co., in which the court rejected plaintiff's argument that disclosures made by Merrill Lynch that are nearly identical to those at issue here "were incomplete and misleading because they failed to apprise investors of the extent to which the market for Merrill ARS was

dependent on Merrill's continued placement of support bids." <u>Wilson</u>, 671 F.3d at 132.  As the

Second Circuit explained, "[e]ven if we were to construe the complaint as attempting to plead

that Merrill, at least for a time, placed support bids in every single auction for Merrill ARS, we

do not see how that allegation can be actionable given Merrill's disclosure that it 'may routinely'

place such bids." <u>Id.</u> at 133.  As to plaintiff's contention that Merrill concealed the riskiness of

ARS as an investment vehicle, the Second Circuit commented:

> More generally, to the extent that [plaintiff's] complaint includes allegations that
> Merrill knew that the ARS market was "unsustainable," that knowledge is not
> alleged to have arisen until "the fall of 2007," <u>i.e.</u>, after [plaintiff] had purchased
> his ARS in July 2007, the credit market had deteriorated, and Merrill and other
> dealers had allowed some ARS auctions to fail.  Taken together, these allegations
> do not support the inference that Merrill knew, <u>at the time of [plaintiff's]
> purchase</u>, that the ARS market was certain to fail in the absence of its
> intervention.

<u>Id.</u> at 134 (emphasis in original).

Here, Plaintiff's allegations fail for the same reasons.  Plaintiff has not pled an

actionable misrepresentation or omission, because JP Morgan repeatedly disclosed that it

routinely placed support bids to prevent ARS auctions from failing.  Moreover, the Complaint

cannot sustain an allegation of misrepresentation or market manipulation on the theory that JP

Morgan failed to disclose its "true purposes" for placing support bids.  <u>See id.</u> at 135 ("Given

Merrill's statements that it believed itself to be at liberty to engage in this market activity and its

discussion of the possible consequences of this activity on the price and liquidity of ARS, its

alleged motivations for placing support bids and its internal assessment of the viability of the

ARS market do not render the disclosed practices manipulative.")  Finally, Plaintiff's bald

assertion that the liquidity of the ARS market "depended exclusively upon [JP Morgan's]

participation" is neither consistent with the Complaint's factual allegations nor sufficiently

particularized to survive a motion to dismiss.  <u>Compare</u> Pltf. Br. at 14 (the liquidity of the ARS

market "depended exclusively upon [JP Morgan's] participation") <u>with</u> Cmplt. (Dkt. No. 1) ¶ 61

("As liquidity in the ARS market deteriorated in 2007, auction managers, including J.P. Morgan,

increased their support for otherwise failing auctions by bidding for their own positions on a

widespread basis, giving other market participants the false impression that the market was

functioning normally when investor demand for ARS had in fact decreased"), ¶ 73 ("As a result

of the withdrawal of support by J.P. Morgan and all other major broker-dealers, the market for

auction rate securities collapsed, rendering more than $300 billion of such securities illiquid.");

<u>see also</u> <u>Citigroup</u>,700 F. Supp. 2d at 304 ("[A] claim for market manipulation must include

specific, particularized allegations as to the nature, purpose, and effect of the fraudulent conduct

and the roles of the defendants in that conduct.")  Accordingly, Plaintiff's material

misrepresentation and market manipulation claims fail.

**B.**     <u>**Plaintiff Has Not Adequately Pled Scienter**</u>

       Plaintiff's claim that JP Morgan engaged in market manipulation or made

misrepresentations in violation of Section 10(b) also fails because, as was true in <u>O'Gara</u>, the

Complaint does not adequately plead scienter.  <u>See</u> <u>O'Gara</u>, 867 F. Supp. 2d at 419-25.  The

PSLRA requires that a plaintiff "state with particularity facts giving rise to a strong inference

that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).  "The

requisite state of mind is an 'intent to deceive, manipulate, or defraud.'"  <u>Defer LP v. Raymond</u>

<u>James Financial</u>, 2010 WL 3452387, at *4 (S.D.N.Y. Sept. 2, 2010) (quoting <u>S. Cherry Street,</u>

<u>LLC v. Hennessee Grp. LLC</u>, 573 F.3d 98, 108 (2d Cir. 2009)).  An inference of scienter is

sufficiently strong if, based on the facts alleged, "a reasonable person would deem [it] cogent

and at least as compelling as any opposing inference one could draw from the facts alleged."

<u>Tellabs</u>, 551 U.S. at 324.   Allegations of scienter must be substantiated by specific facts and

may not be pled in general terms: "[a]llegations that are conclusory or unsupported by factual assertions are insufficient." <u>ATSI Commc'ns</u>, 493 F.3d at 99.

"The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." <u>Id.</u> at 99 (citing <u>Ganino v. Citizens Utilities Co.</u>, 228 F.3d 154, 168-69 (2d Cir. 2000)).  Plaintiff must plead scienter in connection with both market manipulation claims and misrepresentation claims under Section 10(b) and Rule 10b-5. <u>Id.</u> at 102, 99.  Indeed, "[t]his pleading requirement is particularly important in manipulation claims because in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation." <u>Id.</u> at 102.  Here, Plaintiff argues that the Complaint demonstrates that JP Morgan had the motive and opportunity to commit fraud, and offers strong circumstantial evidence of conscious misbehavior or recklessness.

### 1.   <u>Motive and Opportunity</u>

"The type of motive required to plead scienter 'entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'" <u>Vining v. Oppenheimer Holdings, Inc.</u>, 2010 WL 3825722, at *6 (S.D.N.Y. Sept. 29, 2010) (alteration in original) (quoting <u>Novak v. Kasaks</u>, 216 F.3d 300, 307 (2d Cir. 2000)).  Here, as in <u>O'Gara</u>, the Complaint principally alleges that JP Morgan – as the auction dealer in the auctions from which Plaintiff purchased the ARS – was motivated by its desire to "earn[ ] substantial fees from issuers for the management of the auctions." <u>See</u> Cmplt. (Dkt. No. 1) ¶¶ 48-49; <u>see also</u> <u>id.</u> ¶ 60 (alleging that JP Morgan "regularly intervened to prevent failed auctions to ensure it received its management fees and to allow [JP Morgan] to sell the JP ARS it owned").

However, as this Court explained in <u>O'Gara</u>, the fact that JP Morgan earned fees in connection with the sale of ARS is not sufficient to establish its motive to commit fraud.  <u>See</u>

O'Gara, 867 F. Supp. 2d at 420 (citing Steed Finance LDC v. Laser Advisers, Inc., 258 F. Supp. 2d 272, 278 (S.D.N.Y. 2003) (promise of higher fees, without more, "cannot provide the requisite motive" for fraud under the PSLRA);  Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008) ("To accept a generalized allegation of motive based on a desire to continue to obtain management fees would read the scienter requirement out of the statute"); Novak, 216 F.3d 300, 307 (plaintiffs cannot allege scienter "based on motives possessed by virtually all corporate insiders, including (1) the desire to maintain a high corporate credit rating . . . and (2) the desire to maintain a high stock price in order to increase executive compensation")).  As this Court also noted in O'Gara, courts that have considered claims based on the placement of support bids have found that a motive to continue receiving fees does not give rise to a strong inference of scienter.  See id. at 421 (citing Citigroup, 700 F. Supp. 2d at 305 ("Plaintiffs' conclusory allegations regarding Defendants' motive for the alleged manipulation focus principally on Defendants' desire to sell Citigroup ARS to offset subprime market losses and to obtain fees for services in connection with the auctions; they are insufficient to give rise to a strong inference of scienter"); Vining, 2010 WL 3825722, at *7 (S.D.N.Y. Sept. 29, 2010) (quoting Kalnit v. Eichler, 264 F.3d 131, 140 (2d Cir. 2001) ("[Defendant's] profit motive in perpetuating the ARS market in order to maintain relationships with auction dealers and grow its underwriting business is 'a generalized motive . . . not sufficiently concrete for purposes of inferring scienter.'"))).

In its opposition papers, Cellular South – like the plaintiffs in O'Gara – argues that JP Morgan was also motivated to conceal the weakness in the ARS market because "J.P. Morgan has its own inventory of JP [Morgan] ARS, which J.P. Morgan knew it could not liquidate in the event the JP [Morgan] ARS market collapsed." (Pltf. Br. at 21)  Plaintiff also

cites to the Complaint's allegations that (1) "[t]he scheme [ ] permitted J.P. Morgan to sell its inventory of JP [Morgan] ARS to investors, such as Cellular South, at a time when it knew that the inventory would soon become illiquid because it could not continue its systematic policy of placing support bids at ARS auctions" (Cmplt. (Dkt. No. 1) ¶ 5); and (2) "J.P. Morgan [ ] maintained [its] own inventory of auction rate securities, estimated in the May 12, 2008 10-Q to be approximately $2.8 billion" (id. ¶ 50).

These passing references to JP Morgan's ARS inventory fall far short of the PSLRA's requirement that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Moreover, Plaintiff does not explain how JP Morgan's inventory of ARS in May 2008 – nearly nine months after Sovereign purchased the ARS and several months after the ARS market collapsed – bears on the Defendant's knowledge at the time Sovereign purchased the ARS from JP Morgan in August 2007.

Plaintiff's reliance on other ARS cases where courts have found scienter adequately pled is misplaced. See Pltf. Br. at 21-22 (citing Defer, 2010 WL 3452387, at *5; Dow Corning Corp. v. BB & T Corp., 2010 WL 4860354, at *10 (D.N.J. Nov. 23, 2010)). As this Court explained in O'Gara, 867 F. Supp. 2d at 421-22, in both Defer and Dow Corning, there were concrete allegations that the defendants, perceiving the rising liquidity risks of ARS, made the decision to eliminate or dramatically reduce their own inventory of ARS. In Defer, the court found scienter to be adequately pled only for the period during which, according to the complaint, "[the defendant's] employees sent three emails in November and December 2007 to financial advisors allegedly indicating that [the defendant] had a large inventory of ARS and offering incentives to sell them, and . . . [the defendant] needed to sell ARS in late 2007 to

comply with its internal risk limits." Defer, 2010 WL 3452387, at *5. The complaint also pled that, during that same period, the defendant "provided financial advisors with incentives to sell those securities." Id. Relying on those factual allegations, the Defer court concluded that "[g]iven the deterioration of the ARS market that began in August 2007 and [the defendant's] wish to reduce its own position from November 2007 forward, it is quite reasonable to infer that [the defendant] then had a motive to conceal the ARS illiquidity risk from customers to whom it hoped to sell ARS from its own portfolio." Id.

However, the Defer court found that for the period between August 2007 and November 2007 – a period for which the plaintiffs merely pled that "the ARS market deteriorated" – the plaintiffs had not adequately alleged scienter. Id. at *5. The court reasoned that the defendant "could not have been motivated between April 2003 and November 2007 by a desire to unload its own ARS inventory, if indeed it had one during that period, before coming to the conclusion that its inventory should be reduced or sold entirely." Id. Accordingly, the court concluded that plaintiffs had adequately pled scienter only as to the post-November 2007 time period, during which the complaint alleged that defendant had adopted a new policy of unloading ARS inventory.

"Similarly, in Dow Corning, the complaint pled 'that defendants (1) knew that the ARS market would be illiquid without intervention by brokers beginning in Fall 2007 and (2) held large inventories of ARS, which they needed to sell.' Dow Corning, 2010 WL 4860354, at *9. The court applied the reasoning of Defer to find that, because the defendants were engaged in a campaign to dispose of their ARS inventory, it was reasonable to infer that they were motivated to conceal its liquidity risks from investors. Id." O'Gara, 867 F. Supp. 2d at 422.

Here, by contrast, Cellular South has not pled that JP Morgan reached a conclusion – either in August 2007 or at any other point – that it needed to unload its ARS inventory in order to reduce its exposure to rising liquidity risks.  Indeed, Plaintiff does not even plead that JP Morgan actually reduced its ARS inventory during the relevant time period. Moreover, "because JP Morgan also purchased ARS at each auction through its placement of 'support bids,' its sale of ARS in the intervening periods would not point to the conclusion that JP Morgan ever decided that 'its inventory should be reduced or sold entirely,' Defer, 2010 WL 3452387, at *5, and the [Complaint] does not allege that that was the case."  Id.  Instead of alleging that JP Morgan had concluded that it needed to reduce or eliminate its ARS inventory, Cellular South pleads that JP Morgan sought to manage its inventory, seeking to slow its accumulation of the ARS that it purchased through placement of support bids.

In this respect, the Complaint is not

> distinguishable from complaints discussed in other cases in which courts have found scienter to be inadequately pled.  See Ashland, Inc. v. Morgan Stanley & Co., Inc., 700 F. Supp. 2d 453, 468 (S.D.N.Y. 2010) (complaint's "failure to allege facts showing that [the defendant] hoped to induce [the plaintiff] to purchase [ARS] in the auctions to increase or sustain demand for [ARS] so that [the defendant] could sell off its own [ARS] holdings is fatal to the [complaint]"); In re Citigroup Auction Rate Sec. Litig., 700 F. Supp. 2d 294, 305 (S.D.N.Y. 2009) [(scienter is not adequately pled where "Plaintiff's conclusory allegations regarding Defendants' motive for the alleged manipulation focus principally on Defendants' desire to sell Citigroup ARS to offset subprime market losses and to obtain fees for services in connection with the auctions," but do not plead facts establishing that Defendants engaged in a campaign to unload the securities)].

O'Gara, 867 F. Supp. 2d at 423.

Cellular South – like the O'Gara plaintiffs – also points to the above-quoted language from JP Morgan's memorandum to the State of California as proof that JP Morgan acted with scienter.  Compare id. (citing O'Gara Cmplt. ¶ 15).  As an initial matter, the memorandum to the State of California is dated February 1, 2008 – several months after

Sovereign's purchase of ARS on Cellular South's behalf.  (Cmplt. (Dkt. No. 1) ¶ 69;

Youngwood Reply Decl. (Dkt. No. 23), Ex. G)  Furthermore, as this Court found in O'Gara, the

memorandum does not support an inference that JP Morgan was in the process of unloading its

ARS inventory at that point.  O'Gara, 867 F. Supp. 2d at 423.  That memo asserts that "the

auction rate market has experienced a significant dislocation stemming from the liquidity crises

since June 2007," but recommends that the State of California merely "continue in the ARS

mode . . . for the time being . . . but review its exposure over the next three weeks."

(Youngwood Decl. (Dkt. No. 23), Ex. G at 1-2)  This advice does not support an inference that

JP Morgan had concluded that its own inventory of ARS should be "reduced or sold entirely," or

that it was trying to conceal such a strategy from the investing public.  Defer, 2010 WL 3452387,

at *5.

 In sum, Cellular South – unlike the plaintiffs in Defer and Dow Corning – has not

pled facts demonstrating that JP Morgan intended – either at the time Plaintiff purchased its ARS

or at any other time – to unload or reduce its ARS inventory.  Plaintiff has merely alleged that JP

Morgan routinely sold some of ARS it purchased through "support bids," rather than

accumulating an unlimited inventory of the securities.  Accordingly, Plaintiff has not pled facts

sufficient for this Court to infer that JP Morgan had the scienter necessary to engage in fraud,

either through market manipulation or through misrepresentations and omissions.

### 2.      Strong Circumstantial Evidence of Conscious Misbehavior

 If a complaint does not establish motive and opportunity for fraud, it may

nonetheless "satisfy [the scienter] requirement by alleging facts . . . constituting strong

circumstantial evidence of conscious misbehavior or recklessness."  ATSI Commc'ns, 493 F.3d

at 99.  "To survive dismissal under the 'conscious misbehavior' theory, [plaintiffs] must show

that they alleged reckless conduct by the [defendants], which is 'at the least, conduct which is

highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" <u>Kalnit</u>, 264 F.3d at 142 (quoting <u>Honeyman v. Hoyt</u>, 220 F.3d 36, 39 (2d Cir. 2000) (internal citation omitted)). "At least four circumstances may give rise to a strong inference of the requisite scienter:  where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" <u>ECA, Local 132 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.</u>, 553 F.3d 187, 199 (2d Cir. 2009) (quoting <u>Novak</u>, 216 F.3d at 311).

Plaintiff argues that the Complaint alleges facts constituting strong circumstantial evidence of conscious misbehavior or recklessness based on (1) the allegation that "J.P. Morgan marketed JP ARS to the public as 'safe, cash-equivalent products, when in fact they faced increasing liquidity risk'" (Pltf. Br. at 22 (quoting Cmplt. (Dkt. No. 1) ¶ 85); and (2) JP Morgan's February 2008 memo to the State of California, which Plaintiff argues demonstrates that "as early as June 2007, [JP Morgan] knew of 'significant' problems in the [ARS] market" (<u>id.</u> (quoting Cmplt. (Dkt. No. 1) ¶ 69)).

With respect to the first argument, Plaintiff's allegation is entirely conclusory. The only specific factual allegation that even remotely supports Plaintiff's assertion that JP Morgan marketed ARS as "safe, cash-equivalent products," is the Complaint's claim that a JP Morgan employee told Sovereign that ARS are "very liquid" instruments.  (Cmplt. (Dkt. No. 1) ¶ 38)  Plaintiff has not alleged, however, that this statement was false when made.  Nor has Plaintiff alleged the identity of any speaker who claimed that ARS are "safe, cash equivalent

products," or the date(s) on which such statements were made.  Moreover, JP Morgan disclosed – both in its prospectus for the ARS at issue and on its website – "the very practices that [Plaintiff] now claims were fraudulently and intentionally omitted.  [Plaintiff] therefore does not allege a 'compelling' inference of scienter." In re Merrill Lynch Auction Rate Sec. Litig., 765 F. Supp. 2d 375, 387 (S.D.N.Y. 2011) ("Merrill II") (citing Tellabs, 551 U.S. at 324).

JP Morgan's February 2008 memo to the State of California likewise does not give rise a strong inference of conscious misbehavior:  the memo references "significant dislocation" in the ARS market, but essentially advises the State to monitor its ARS, rather than immediately disengaging from the ARS market.  (Youngwood Reply Decl. (Dkt. No. 23), Ex. G at 1)  Indeed, the memorandum – which is dated less than two weeks before the collapse of the ARS market – recommends that California "continue in the ARS mode on its 2003D bonds for the time being, but review its exposure over the next three weeks as two additional series . . . reset for an additional 35 days." (Id. at 3)  The memo concludes by noting that "the State will have ample time to consider possible alternatives to staying in the ARS mode."  Far from evidencing conscious misbehavior, the memo demonstrates that its drafters continued to believe that the ARS market would remain liquid.[8]

For all the reasons stated above, Plaintiff's securities fraud claims will be dismissed.

---

[8]  Because this Court concludes that Plaintiff's Section 10(b) claim fails to adequately allege manipulative conduct or scienter, it is not necessary to address Defendant's remaining arguments in favor of dismissal.

## III    MISSISSIPPI STATE LAW CLAIMS

### A.    Mississippi Securities Laws

Plaintiff alleges that Defendant violated Miss. Code Ann. § 75-71-717(a)(2),[9]

which provides:

> Any person who . . . offers or sells a security . . . by the use of any written or oral communication which contains any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable case could not have known, of the untruth or omission, is liable to the person buying the security from him . . . .

This claim fails because Plaintiff has not alleged a material misstatement or

omission with the requisite degree of particularity.  As a preliminary matter, Plaintiff questions

whether Rule 9(b) applies here.  The Second Circuit has held, however, that Rule 9(b) "is cast in

terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or

expressed in terms of the constituent elements of a fraud cause of action."  Rombach, 355 F.3d at

171.  Accordingly, Rule 9(b) applies here because Plaintiff's claim sounds in fraud.  Accord In re

Merrill Lynch Auction Rate Sec. Litig., 886 F. Supp. 2d 340, 346 (S.D.N.Y. 2012) ("Merrill

IV") (concluding that a Miss. Code Ann. § 75-71-717(a)(2) claim "sounds in fraud and the

heightened pleading requirement of Fed. R. Civ. P. 9(b) therefore applies"), aff'd sub nom.

Cellular S. Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 516 F. App'x 30 (2d Cir. 2013).

The crux of Plaintiff's misrepresentation claim is that JP Morgan violated the law

when its employee "repeatedly represented" to Sovereign that "JP [Morgan] ARS are very liquid

investments."  (Cmplt. (Dkt. No. 2) ¶ 40)  Plaintiff, however, has provided no allegations

---

[9] Plaintiff has withdrawn its claim under Miss. Code Ann. § 75-71-501.  Accordingly, that claim will be dismissed.

concerning when or where these purported misrepresentations were made.  See Ashland v.
Oppenheimer & Co, Inc., 689 F. Supp. 2d 874, 883 (E.D. Ky. 2010) (dismissing complaint
where plaintiff's "allegations largely fail to identify the specific date or location of the alleged
misrepresentations"), aff'd, 648 F.3d 461 (6th Cir. 2011).  Moreover, the alleged misstatements
took place before Sovereign's August 2007 purchase of the securities at issue, and well before
the collapse of the ARS market.  The mere fact that the ARS market later became illiquid does
not automatically transform a JP Morgan employee's 2007 statement into an actionable
misrepresentation.  In order to survive a motion to dismiss, Plaintiff must provide specific factual
allegations to show that the speaker knew the statement was false at the time it was made.
Because Plaintiff has not done so here, the Mississippi securities law claim must be dismissed.

Plaintiff's assertion that JP Morgan failed to disclose that it routinely placed
auction bids "in order to prevent auction failure and perpetuate the illusion of an active, viable
market" fails also because – as discussed in detail above – JP Morgan's disclosures were
sufficient to apprise investors of the precise activities about which Plaintiff complains.  "'[I]t is
indisputable that there can be no omission where the allegedly omitted facts are disclosed.'"
SRM Global Fund L.P. v. Countrywide Fin. Corp., 09 CIV. 5064 (RMB), 2010 WL 2473595, at
*8 (S.D.N.Y. June 17, 2010) (quoting In re Progress Energy, Inc., 371 F. Supp. 2d 548, 552
(S.D.N.Y. 2005)), aff'd sub nom. SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp., 448
F. App'x 116 (2d Cir. 2011).

**B.     Breach of Contract and Breach of the Implied
        Covenant of Good Faith and Fair Dealing**

Plaintiff's claims for breach of contract and breach of the implied covenant of
good faith and fair dealing fail because Plaintiff has not plausibly alleged the existence of a bona
fide contract between itself and JP Morgan.  See Rotenberry v. Hooker, 864 So.2d 266, 270

(Miss. 2003) (under Mississippi law, a contract requires "(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation").

Here, Plaintiff merely alleges that JP Morgan "promised to sell Cellular South 'very liquid' securities in the form of JP [Morgan] ARS." (Cmplt. (Dkt. No. 1) ¶ 137)  But this statement does not demonstrate the existence of a contract between Cellular South and JP Morgan.  Indeed, Plaintiff has not pled any of the terms of the purported contractual agreement. This alone is fatal to its contract-based claims.  See Rotenberry, 864 So.2d at 270 (identifying "an agreement that is sufficiently definite" as one of the required elements of a breach of contract claim); Merrill IV, 886 F. Supp. 2d at 346 (citing Favre Property Mgmt., LLC v. Cinque Bambini, 863 So.2d 1037, 1044 (Miss. Ct. App. 2004) ('The elements of a breach of contract [include] . . . the existence of a valid and binding contract . . . ."); Patton v. State Bank & Trust Co., 936 So.2d 391, 394 (Miss. Ct. App. 2006) (noting that absent the existence of a contract, "there can be no breach of the covenant of good faith and fair dealing")).

To the extent that Plaintiff argues that it entered into an oral contract with JP Morgan – separate and apart from the ARS offering documents discussed above – that claim fails as well.  As Judge Preska noted in dismissing an identical claim brought by Plaintiff against Merrill Lynch,

> Plaintiff's assertion of an independent and enforceable oral contract based solely on Merrill's pre-contractual language is implausible. . . . The Court finds that in addition to being highly general and prospective in nature, Merrill's language regarding "very liquid" securities is not the promise for which Plaintiff gave consideration.  Rather, Plaintiff's consideration was exchanged for nothing more or less than the promises (and relevant disclaimers) contained within the ARS transaction documents.  Plaintiff cannot now claim that it paid the same valuable consideration for both the qualified promises made in the ARS transactional documents and an entirely independent and enforceable oral promise made prior to executing the ARS purchases at issue.

Merrill IV, 886 F. Supp. 2d at 346.

Accordingly, this Court finds that Plaintiff has not sufficiently alleged the existence of a contract that Defendant purportedly breached. Plaintiff's claims for breach of contract and breach of the implied covenant of good faith and fair dealing will therefore be dismissed.

### C.     Fraudulent or Negligent Misrepresentation

Plaintiff has not pled a plausible violation of common law fraudulent or negligent misrepresentation. As in Merrill IV,

> [this] Court has already concluded that Plaintiff fails to state an actionable misrepresentation, omission, or manipulative conduct in connection with its federal securities law claims. Because it is also a required element of Plaintiff's common law claims for fraudulent or negligent misrepresentation, the failure to state an actionable misrepresentation or omission is fatal to these claims regardless of the applicable pleading standard.

Id. at 347 (citing Schmidt v. Catholic Diocese of Biloxi, 18 So.3d 814, 831 (Miss. 2009) (elements of fraudulent misrepresentation under Mississippi law include, inter alia, a false representation); Hazlehurst Lumber Co., Inc. v. Miss. Forestry Comm'n, 983 So.2d 309, 313 (Miss. 2008) (Mississippi negligent misrepresentation claim includes "a misrepresentation or omission of a fact . . . that . . . is material or significant")). Accordingly, Plaintiff's claims for fraudulent and negligent misrepresentation will be dismissed.

## CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is granted with

prejudice.  The Clerk of the Court is directed to terminate the motion (Dkt. No. 19) and to close

this case.

Dated:  New York, New York             SO ORDERED.
       September 30, 2014

                                           Paul G. Gardephe
                                           United States District Judge